ANNA TRYON PLETCHER (CSBN 239730)
MANISH KUMAR (CSBN 269493)
ASHLEY EICKHOF (CSBN 307143)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
manish.kumar@usdoj.gov
Telephone: (415) 934-5300

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALVIN FLORIDA, JR.,<br>ROBERT ALHASHASH RASHEED,<br>JOHN LEE BERRY, III,<br>REFUGIO DIAZ, and<br>STEPHAN ALEXANDER FLORIDA,<br><br>Defendants. | CASE NO. CR 4:14-00582 PJH<br><br>**UNITED STATES' NOTICE OF COCONSPIRATOR STATEMENTS**<br><br>Pretrial Conference: September 28, 2016, at 2:30 p.m.<br>Trial: October 31, 2016<br>Court: Hon. Chief Judge Phyllis J. Hamilton |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………...………......ii

INTRODUCTION ................................................................................................................................1

LEGAL STANDARD..........................................................................................................................1

ARGUMENT.......................................................................................................................................2

I.      The Existence of the Conspiracy and Defendants' Participation......................................................4

      A.      Proof of the Existence of the Bid-Rigging Conspiracy and Mail-Fraud Scheme................4

      B.      Defendants' Membership in the Conspiracy........................................................................8

II.     Factual Proffer Establishing Statements Made During and in Furtherance of the Conspiracy ........................................................................................................................11

      A.      Round Sheets ......................................................................................................................11

      B.      Payoff Ledgers ...................................................................................................................12

      C.      Emails .................................................................................................................................12

      D.      Recordings .........................................................................................................................12

      E.      Other ...................................................................................................................................12

      F.      Anticipated Witness Testimony .........................................................................................13

      G.     Documents Seized from Offices of Monetary Investments, LLC ....................................13

CONCLUSION.................................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Bourjaily v. United States*, 483 U.S. 171 (1987)……………………………………………………..1, 15

*United States v. Coleman*, CR 4:11-CR-00904 PJH......................................................................... 2, 3

*United States v. Cruz*, 910 F.2d 1072 n. 10 (3d Cir. 1990)................................................................ 14

*United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988)..................................................... 14

*United States v. Gil,* 58 F.3d 1414 (9th Cir. 1995) ............................................................................ 14

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988)..................................................................... 1

*United States v. Helmel*, 769 F.2d 1306 (8th Cir. 1985).................................................................... 14

*United States v. Herrera-Gonzalez*, 263 F.3d 1092 (9th Cir. 2001)..................................................... 2

*United States v. Kramer*, CR 4:11-00423 PJH .................................................................................... 5

*United States v. Larson*, 460 F.3d. 1200 (9th Cir. 2006) ..................................................................... 1

*United States v. Martinez*, 430 F.3d 317 (6th Cir. 2005) .................................................................. 14

*United States v. Mason*, 658 F. 2d 1263 (9th Cir. 1981) ..................................................................... 2

*United States v. Pang*, 362 F.3d 1187 (9th Cir. 2004)...................................................................... 13

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009) .......................................................................... 2

*United States v. Schmit*, 881 F.2d 608 n.6 (9th Cir. 1989) ............................................................... 14

*United States v. Solorza*, CR 4:09-00217 PJH.................................................................................... 2

*United States v. Stapleton*, 293 F.3d 1111 (9th Cir. 2002) ................................................................. 4

*United States v. Tamez*, 941 F.2d 770 (9th Cir. 1991)........................................................................ 2

*United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 1988)............................................................... 3

*United States v. Zaragoza*, CR 4:08-0083 PJH............................................................................... 2, 3

**STATUTES**

15 U.S.C. § 1...................................................................................................................................... 4

18 U.S.C. § 1341................................................................................................................................ 4

**RULES**

Criminal Local Rule 16-1(c)........................................................................................................... 1, 2

Criminal Local Rule 16-1(c)(4) ......................................................................................................... 1

Federal Rule of Evidence 801(d)(2)(E) .................................................................................... *passim*

Federal Rule of Evidence 803(6) ................................................................................................. 3

## INTRODUCTION

This case involves a bid-rigging conspiracy and mail-fraud scheme that systematically corrupted the auction of hundreds of foreclosed properties in Northern California. Dozens of conspirators participated in this conduct, several of whom have pleaded guilty before this Court and will be cooperating witnesses at trial. Their written and oral statements will comprise a portion of the evidence presented in the government's case-in-chief. Accordingly, the government seeks to introduce such evidence at trial as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). Criminal Local Rule 16-1(c)(4) requires the government to give notice of the coconspirator statements it intends to offer at trial, and the Court has discretion in determining the order of proof for ruling on the admissibility of those statements. The government hereby provides that notice pursuant to the Court's pretrial order (Doc. no. 186) and requests the Court to conditionally admit the attached coconspirator statements.

## LEGAL STANDARD

Criminal Local Rule 16-1(c) requires supplemental disclosure of "[a] summary of any statement the government intends to offer under Fed. R. Evid. 801(d)(2)(E) in sufficient detail that the Court may rule on the admissibility of the statement" in order to "expedite the trial of the case." Admissibility under 801(d)(2)(E) requires a showing by a preponderance of the evidence that "(1) the conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made 'in furtherance of' the conspiracy." *United States v. Larson*, 460 F.3d 1200, 1211 (9th Cir. 2006) (citations omitted), *adopted in relevant part on reh'g en banc*, 495 F.3d 1094, 1096 n.4 (9th Cir. 2007); *see Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (preponderance standard applies for determining facts relevant to Rule 801(d)(2)(E)). The Confrontation Clause does not require the court to make an inquiry into the independent indicia of the reliability of the statement. *Id.* at 175-76.

Although coconspirator statements alone cannot prove the existence of a conspiracy, the statements themselves may be considered in determining the existence of the conspiracy. *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988); *see also Bourjaily*, 483 U.S. at 181 (stating that "the judge should receive the evidence and give it such weight as his judgment and experience counsel")

(quotations and citations omitted); *United States v. Tamez*, 941 F.2d 770, 774-75 (9th Cir. 1991). Once the government shows evidence of a conspiracy, the government need only present slight evidence connecting the defendant to the conspiracy. *United States v. Mason*, 658 F. 2d 1263, 1269 (9th Cir. 1981). Recognizing that conspiracies are generally clandestine agreements not capable of direct proof, the Ninth Circuit has held that proof of the slight connection "may be inferred by circumstantial evidence." *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009) (*citing United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001)).

**ARGUMENT**

This memorandum seeks to provide the Court with a factual proffer sufficient to establish the first two elements under Rule 801(d)(2)(E): the existence of a conspiracy and defendants' involvement in the conspiracy. In addition, consistent with the Court's established procedure for complying with Local Rule 16-1(c), the government will provide as to each coconspirator statement sought to be introduced at trial:

(1) the identity of the testifying witness and/or the source of the conspirator statement;

(2) a statement describing the witness and/or the source of the conspirator statement;

(3) a summary of evidence sufficient to show that the proffering witness, if a conspirator, knew about and participated in the conspiracy;

(4) the *specific* coconspirator statements to be introduced via that witness and/or the source of the conspirator statement;

(5) the identity or, if the identity is unknown, a description, of the declarant of *each* specific coconspirator statement; and

(6) a summary of evidence sufficient to show that each declarant of the conspirator statement(s) knew about and participated in the conspiracy.

*See United States v. Coleman*, CR 4:11-CR-00904 PJH, Doc. no. 88 at 4 (Pretrial Order No. 1); *United States v. Solorza*, CR 4:09-00217 PJH, Doc. no 92 at 4 (Final Pretrial Order); *United States v. Zaragoza*, CR 4:08-0083 PJH, Doc. no. 576 at 5 (Amended Order for Pretrial Preparation for Criminal Jury Trial). This information is provided in the attached Appendices A through F.

/ /

Evidence supporting the third element—that the statement was made in furtherance of the conspiracy—is provided in Part II below and will also be introduced at trial. To be made in furtherance of the conspiracy, a statement "must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy." *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988). Courts have interpreted the "in furtherance of" requirement broadly. *See id.* at 1535-36.

Based on the Court's prior rulings on Rule 801(d)(2)(E), the government understands that the Court will refrain from ruling on the third prong—that the statement was made in furtherance of the conspiracy—and therefore the ultimate admissibility determination, until after trial. *See Coleman*, Doc. no. 88 at 3 (Final Pretrial Order); *Zaragoza*, Doc. no. 576 at 5 (Amended Order for Pretrial Preparation for Criminal Jury Trial). However, based on the evidence proffered in this notice, the government requests the Court to make a pretrial ruling on the first two prongs: that the conspiracy existed when the statement was made and that defendants had knowledge of, and participated in, the conspiracy. This will help the government streamline its evidence and efficiently present its case-in-chief at trial.

Out of an abundance of caution, the government is noticing statements that may also be non-hearsay for reasons other than Federal Rule of Evidence 801(d)(2)(E) or admissible under an exception to the hearsay rule. The inclusion of a statement in this disclosure should not be interpreted as an admission by the government that the statement is hearsay, or that it is admissible solely, or even primarily, as a coconspirator statement. For example, some of the statements included in this notice are also admissible because they are part of a business record that is admissible pursuant to Federal Rule of Evidence 803(6), or because they are not offered for the truth of the matter asserted, and are therefore not hearsay. The government reserves its right to argue an alternative evidentiary basis for the admission for any of the statements contained in this notice.

The coconspirator statements noticed here will be offered in support of the bid-rigging conspiracy charged in Count One as well as the mail-fraud scheme charged in Counts Two through Nine.[1] That the mail-fraud counts are charged as a scheme rather than a conspiracy does not affect the

---

[1] There is a currently pending motion to dismiss the mail-fraud counts after the Court recently vacated its prior order denying the motion. Order Vacating Motion, Doc. no. 193.

analysis under Rule 801(d)(2)(E). Statements made in furtherance of a scheme to defraud are admissible on the same basis as coconspirator statements. *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002). Therefore, this notice will establish the existence of, and defendants' participation in, both the bid-rigging conspiracy and the mail-fraud scheme that affected the Alameda County foreclosure auctions. For ease of reference, the remainder of this notice will refer to the participants in both types of group criminal conduct simply as conspirators or coconspirators.

## I. The Existence of the Conspiracy and Defendants' Participation

On November 19, 2014, a federal grand jury indicted defendants for bid rigging, in violation of 15 U.S.C. § 1, and mail fraud, in violation of 18 U.S.C. § 1341. All defendants are charged with one count of bid rigging in connection with the conspiracy in Alameda County. Indictment, Doc. no. 1, Count 1. Various subsets of defendants are charged in eight counts of mail fraud, comprising a scheme to defraud involving hundreds of properties in Alameda County. *Id.*, Counts 2-9.

### A. Proof of the Existence of the Bid-Rigging Conspiracy and Mail-Fraud Scheme

The indictment alleges that defendants engaged in a bid-rigging conspiracy and mail-fraud scheme beginning as early as May 2008 and continuing until in or about December 2010. Indictment ¶¶ 7, 15, 23, 30. When a California homeowner defaults on a loan, the property is typically subject to a process called nonjudicial foreclosure. This process authorizes a third-party trustee to sell the property at a public, competitive auction and distribute the proceeds to the beneficiary of the loan and, depending on the equity in the house, the homeowner. During the height of the financial crisis, defendants and their coconspirators engaged in a criminal conspiracy that corrupted this system.

Twenty-five individuals admitted to this Court to participating in the same bid-rigging and mail-fraud conduct alleged in the indictment. These defendants acknowledged that "[t]he primary purpose of this conspiracy was to suppress and restrain competition to purchase the Alameda County selected properties at noncompetitive prices," just as the indictment alleges in this case. The time periods during which each of the 25 defendants admitted to participating in the criminal conduct overlaps at least in part with the instant indictment. And the conduct to which each of these defendants pleaded is the same: with regard to bid rigging, "agree[ing] not to bid against one another," and with regard to mail fraud, "hold[ing] private auctions ["rounds"], open only to members of the conspiracy, to rebid the real estate,"

knowingly employing "material false pretenses, representations, or promises," and "causing false, artificially low sales prices to be reported to and paid to victims of the scheme." *Compare* Plea Agreement, *United States v. Kramer*, CR 4:11-00423 PJH, ¶¶ 4(a) and 4(b) *with* Indictment, ¶¶ 9 and 16.

Witness interviews, documents, and audio/visual evidence demonstrate that the bid-rigging conspiracy consisted of an overarching agreement among the would-be competitors not to bid on properties sold at the Alameda County foreclosure auctions. Instead, the conspirators took turns purchasing the properties at noncompetitive prices. By working collectively to rig the auctions, the round participants were assured a stream of payoffs from their fellow coconspirators. Day to day, the bid-rigging conspiracy operated in two phases: First, the conspirators determined who was "in" on a given property, i.e., interested in acquiring the property through a rigged auction. Second, a conspirator "took" the property, i.e., was the conspirator designated to purchase the property at the public auction while the others refrained from bidding.

The fraud scheme followed after the bid rigging and operated as follows: First, after the public auction, the conspirators engaged in a "round," a system of successive bidding to determine who would purchase the property and the amount of payoffs that the other coconspirators would be paid for rigging the auction. Next, the conspirators submitted auction paperwork containing misleading representations to facilitate the acquisition of the property following a round. Finally, the conspirators would receive the deed to the illegally acquired property and make the payoffs they had previously determined.

In this way, defendants and their conspirators corrupted the sale of more than 300 properties in Alameda County between 2009 until 2011. Each step in the bid-rigging and fraud conduct is further described below.

### 1. Rigging the Public Auction

First, rather than competitively bidding against each other during the public auction, defendants and their coconspirators would refrain from bidding against one another for certain properties. Sometimes they determined which properties to rig before the auction. Declaration of Special Agent Deborah Bond ("Decl.") ¶ 2. Alternatively, it was done during the public auction for a given property. *Id.* To give each other time to work out who was "in" and who would acquire the property at the public

auction, conspirators would often bid in small increments, usually $100. *Id.* ¶ 3. The conspirators used code words, phrases, and gestures to communicate their intent to stop bidding and "round" a property. *Id.* ¶ 4. For example, they would ask one another whether they wanted to "work it out" or "work this" or "you in?" Alternatively, the conspirators would simply gesture to each other, such as a wink or a nod. *Id.*

Once they determined who was in, the conspirators would select one person to "take" the property—the coconspirators' term for purchasing the property and tendering funds—at the public auction. *Id.* ¶ 5. This person would continue bidding at the public auction until he or she outbid any other auction bidders who were not a part of the conspiracy. *Id.* ¶ 6. The auctioneer would then announce that the property was sold, and the coconspirator would provide the auctioneer with checks to purchase the property. *Id.* ¶ 7. By not competing against each other, defendants acquired properties at the public auction at below-market prices and maximized their potential resale value.

### 2. Rounds and Step-Aside Payments

After the public auction, defendants negotiated the payoff for agreeing not to compete and decided who would ultimately take title to the property. At times, the bidder who wanted to purchase the home paid the others a negotiated flat amount that was sometimes referred to as a "step-aside" payment. *Id.* ¶ 8. More frequently, however, defendants held private auctions, called "round robins" or "rounds," in which they re-auctioned the property among just the conspirators. The conspirators would often stand in a group and bid in small increments—generally $200—in the order they were standing. *Id.* ¶ 9. The prevailing bidder in the round owed that money to the losing round bidders. This payoff was distributed among the round participants using a formula that increased the payoff the longer a participant remained in the round. *Id.* ¶ 10. To keep track of the round participants and payoff amounts, the conspirators created "round sheets." Round sheets typically listed the participants in the round, the amount each participant bid on the round, the property address, and calculations for determining how much each participant was owed.

There were other rules to the round as well. Some conspirators required that each participant prove that they had sufficient funds to cover the public auction purchase price. *Id.* ¶ 11. If a participant
//

could not produce a cashier's check to cover the purchase price, he could not participate in the round. *Id*. This practice ensured that only legitimate competitors were a part of the round.

Larger organizations, such as defendant Florida's, were also allowed multiple "seats" in the round. *Id.* ¶ 12. This meant that each representative in a given organization could bid in the round and collect a payoff. However, the representative collected the payoff or paid on behalf of the organization itself.

It was also possible to obtain a form of "insurance" when participating in a round. If a conspirator was interested in receiving a round payoff rather than acquiring the property, she or he could obtain insurance from another round participant. *Id.* ¶ 13. The insured conspirator could then continue bidding in the round to maximize the payoff. If the insured conspirator won the round, the insuring conspirator would take the place of the insured for purposes of acquiring the property and making payoffs to the coconspirators. *Id.* If the insured conspirator did not win the round, he or she would owe half of the payoff money to the insurer as compensation for the insurance. *Id.* Through this sophisticated system of second auctions, the conspirators determined how much they would be paid and by whom.

### 3. Auction Paperwork

The third part of the scheme involved preparing fraudulent paperwork. After the round, the round winner completed the sale by filling out and signing a Receipt of Funds ("ROF") that was submitted to the auctioneer. *Id.* ¶ 7. The ROF was a document that was used by the trustee to determine the winner of the public auction, how much the property sold for, and to whom title should be issued. *Id.* ¶ 14. To ensure that title to the property issued to the round winner, who was not necessarily the person who won the public auction, the conspirators provided information on the ROF that created the false impression that the round winner had bid competitively at and won the public auction, and then they falsely certified that the information was true and correct. *Id.* ¶ 15.

### 4. Making and Receiving Payoffs

Finally, the auctioneer mailed the completed auction paperwork and purchase funds to the trustee, often by FedEx. *Id.* ¶ 16. Once the trustee received the funds and auction paperwork, the trustee mailed the funds to the lienholder and the title and Deed of Trust to the buyer listed on the ROF. *Id.* ¶

14. Typically, payoff money for the rounds was not due until the round winner received the Deed of Trust in the mail. *Id.* ¶ 17, 19. This was because the sale of the property could be rescinded by the trustee after the sale at the public auction. The rule of the conspiracy was that if no property exchanged hands, the round winner did not have to make any payoffs to his coconspirators for rigging the auction.

Round payments were made by cash or check. *Id.* ¶ 18. For newer members of the conspiracy, round payments were sometimes required that same day or the day after. For frequent participants, the coconspirators often let the round payments accrue for some amount of time and then would meet with one another to reconcile their respective debts, as further discussed below. *Id.* ¶ 20. The payoffs would then be made at the auctions or at a coconspirator's office. *Id.*

These payments played a dual role. They were payoffs in exchange for not bidding at the public auction and they represented the amount of money that the conspirators stole from the beneficiaries for their personal enrichment. The payoffs also reflected a quid pro quo: The reason that a conspirator was willing to pay off competing bidders—rather than bid against them in a competitive auction—was not only because the conspiracy allowed them to acquire the properties at a cheaper price. Participating in the conspiracy by making payoffs was also a means of ensuring that one would receive payoffs from future rigged properties. The conspiracy was therefore a means to efficiently acquire properties at below-market prices while receiving a steady stream of cash payoffs.

**B.  Defendants' Membership in the Conspiracy**

The evidence proffered below establishes by preponderance that each defendant knowingly participated in the bid-rigging conspiracy and mail-fraud scheme.

**1.  Alvin Florida, Jr.**

Defendant Florida is the principal of Monetary Investments, LLC, a business that acquired foreclosure properties for investors. According to Florida, he has been in the foreclosure auctions business for over 30 years, and several of the defendants in the related cases started out as Florida's clients or business associates, including codefendant Rasheed. *Id.* ¶ 21. According to the United States' investigation, Florida and his codefendant employees are implicated in more than 300 rigged properties in Alameda County.

//

Cooperating defendants identified Florida as a key member of the Alameda County conspiracy, characterizing him as the "godfather," "king," and a "big fish." *Id.* ¶ 22. Florida attended the foreclosure auctions in person and had been observed participating in rounds as far back as the 1980s. *Id.* ¶ 23. Florida played a leading role in organizing and implementing the conspiracy. *Id.* ¶ 24. He often organized his coconspirators to rig the auction so that a property could be subsequently rounded. *Id.* ¶ 25. For example, he would approach bidders during the public auction and pressure them to stop bidding against him and enter into rounds or pay him off. *Id.* ¶¶ 26-27. If a bidder refused to pay, Florida would threaten to outbid the bidder on future properties. *Id.* ¶ 28. Florida also spread misinformation about properties to discourage competitive bidding and verbally confronted other bidders to dissuade them from participating in the auctions. *Id.* ¶ 29. He organized rounds and acted as the round auctioneer. *Id.* ¶ 30. Finally, Florida attempted to influence auctioneers to reverse the sale of a property. *Id.* ¶ 31.

Florida often brought an employee with him to the auctions, including codefendants Berry, Diaz, and Stephan Florida. *Id.* ¶ 32. Florida used these employees to discourage competitive bidding by creating an intimidating air about himself or create the illusion that there was great interest in the market for a property. *Id.* These employees would also act as Florida's surrogate during auctions in which Florida was not present, as further discussed below.

The FBI executed a search warrant at Florida's offices. It was his practice to keep notes of rounds during auctions and maintain them at his office to keep track of the payoffs owed. *Id.* ¶ 33. Hundreds of round sheets, payoff ledgers, and other documentary evidence describing rigged properties were recovered and constitute party-opponent statements under Fed. R. Evid. 801(d)(2). At trial, the evidence will show that Florida negotiated a payoff agreement with an undercover agent and led a round in which the agent participated.

### 2. Robert Rasheed

Defendant Rasheed invested in foreclosure properties through his business entity Dover Investments, LLC, and was a frequent participant in rounds and payoffs. He was one of the ringleaders of the conspiracy, and witnesses called him one of the "leaders" and a "big fish." *Id.* ¶¶ 34-35. Approximately 31 witnesses implicated him in rounds, and he is involved in more than 200 rigged

properties. *Id.* ¶ 36. Defendant Rasheed pressured auction attendees to participate in rounds or payoffs, organized rounds, employed a notetaker during rounds, and collected and made payoffs owed for rounds from coconspirators. *Id.* ¶¶ 37-40.

Defendant Rasheed voluntarily confessed to participating in bid rigging during an interview with the FBI. He described how the secondary auctions worked and admitted to making and receiving payoffs in connection with secondary auctions. *Id.* ¶ 41. At trial, the evidence will show that defendant Rasheed also accepted a payoff from an undercover agent after participating in a round with him.

Extensive documentary evidence implicates defendant Rasheed in the conspiracy and scheme. In addition to the numerous documents provided by his coconspirators detailing defendant Rasheed's participation in rounds and payoffs, his company produced several round sheets bearing Rasheed's name and detailing his participation in rounds over several months, some of which are noticed here. *See* Appendix A.

### 3. John Berry

Defendant Berry is Florida's son-in-law and regularly attended the trustee auctions as Florida's representative. *Id.* ¶¶ 43, 46. Approximately 14 witnesses implicated defendant Berry in rounds, and he is associated with more than 80 rigged properties. Berry sometimes bid as a second seat alongside Florida or one of his employees to increase the share of payoffs to Florida's organization. Berry was sometimes observed bidding during auctions while receiving direction from defendant Florida over his cell phone. *Id.* ¶ 43.

### 4. Refugio Diaz

Defendant Diaz is a former employee of Florida who participated in the charged conduct. More than a dozen witnesses implicate defendant Diaz, and he involved in more than 80 bid-rigged properties. *Id.* ¶ 44. Witnesses recalled that defendant Diaz regularly attended the auctions and was defendant Florida's representative at times when Florida was not in attendance. On behalf of the Florida organization, Diaz performed such functions as negotiating with other bidders to stop bidding during the auction, participating in rounds, organizing and leading rounds, negotiating and making payoffs, and keeping track of rounds. *Id.* ¶¶ 45-47.

//

### 5. Stephan Florida

Defendant Stephan Florida regularly attended the auctions and participated in rounds and payoffs during the conspiracy period. Along with codefendants Berry and Diaz, Stephan Florida engaged in this conduct with or on behalf of Alvin Florida, his father. Approximately 15 witnesses identify Stephan Florida as a round participant, and he participated in at least 35 rigged auctions. *Id.* ¶ 48. According to one witness, Stephan Florida was part of the "core group" of people who attended the Alameda County trustee auctions on a nearly daily basis. *Id.* ¶ 49. Stephan Florida was observed taking notes during rounds and organizing rounds. *Id.* ¶ 46. At trial, the evidence will show that he negotiated a payoff agreement with an undercover agent on behalf of Alvin Florida.

## II. Factual Proffer Establishing Statements Made During and in Furtherance of the Conspiracy

The attached appendices and exhibits identify the coconspirator statements the government will seek to introduce at trial. Although the government understands that the Court may reserve its ruling on whether each statement was made in furtherance of the conspiracy until the conclusion of the government's case-in-chief, the following factual proffer is offered as additional evidence that the statements were made in furtherance of the conspiracy.

### A. Round Sheets

As outlined in Appendix A, the government will seek to introduce numerous coconspirators' round sheets. Round sheets were an integral part of the bid-rigging conspiracy and scheme to defraud. During the round, these documents were used to track the individuals participating in the round, the order of their successive bids, the amount of each coconspirator's terminal bid, and the winner of the round. A formula was then applied to the conspirators' bid amounts recorded on the round sheet to determine how much money the round winner owed to his coconspirators. This calculation was sometimes recorded on the round sheet itself. In short, the round sheets facilitated the conspiracy by providing a record of who was to ultimately purchase the property and how much payoff money was owed and to whom.

//

//

### B. Payoff Ledgers

The payoff ledgers noticed in Appendix B served an analogous recordkeeping function to the round sheets. The ledgers typically listed the properties in which two conspirators participated in a round and the sum of money for the payoff on each property. A ledger might also contain a calculation that reflected the net payoff for several bid-rigged properties.

Like the round sheets, payment ledgers furthered the conspiracy by providing a record of how much money was owed between coconspirators. These ledgers enabled the conspiracy to operate more efficiently by allowing the coconspirators to aggregate the payoffs owed to each other and then make a single, net payoff for multiple bid-rigged properties. For example, witness testimony will show that Florida would meet with coconspirators at his office to reconcile round payments owed to each other using such ledgers. *Id.* ¶ 50. At trial, the government intends to introduce payment legers attributable to both defendants Florida and Rasheed.

### C. Emails

Occasionally, the coconspirators sent emails regarding payments owed for rounds. Emails that the government will seek to introduce as coconspirator statements are described in Appendix C. Such communications were in furtherance of the conspiracy because they enabled coconspirators to track amounts owed, which enabled them to enforce their agreements.

### D. Recordings

The government will also introduce coconspirator statements in three consensual audio-video recordings of bid-rigged properties. These statements are outlined in Appendix D. In these recordings, defendants and their coconspirators can be seen and heard participating in rounds and negotiating payoffs. The statements made during each of these activities are definitive proof of defendants' participation in the conspiracy and demonstrate their acts in furtherance of the conspiracy.

### E. Other

In addition to the types of documents described above, the government intends to introduce other documents containing coconspirator statements. First, the government has noticed information written

//

//

by coconspirators on the memo lines of payoff checks, such as the address of the rigged property.[2] The information on the memo lines helped the coconspirators keep track of which payoff was associated with a particular rigged property. Second, the government has noticed expense sheets where conspirators calculated their acquisition costs for a given property, including payoffs. These documents were created in furtherance of the conspiracy because they enabled members of the conspiracy to assess their costs and revenues from the scheme. The government has also noticed other documents containing conspirators' notes relating to meetings and payoffs.

### F. Anticipated Witness Testimony

Witnesses at trial will testify to what coconspirators said to reach agreements to rig the public auctions, conduct rounds, determine and make payoffs, and conceal their conduct. For example, they may testify to what a coconspirator said during an auction to designate a property for rounding, or to statements made by another coconspirator regarding the amount and timing of a payoff. This was a conspiracy in which defendants participated, for the most part, face-to-face or over the phone. Their statements to each other were in furtherance of nearly all aspects of the conspiracy: how they recruited new members, reached agreements not to bid and to stop bidding, conducted rounds, negotiated payoffs, made false and misleading statements, and concealed their conduct.

Appendix F describes coconspirator statements that the government's witnesses may include in their testimony at trial. The government has created this appendix by drawing from reports of prior interviews with the witnesses, with the caveat that the reports have not been reviewed or adopted by the witnesses and are not verbatim transcripts of the witnesses' statements.

### G. Documents Seized from Offices of Monetary Investments, LLC

Included in Appendices A through E are documents seized from the offices where Alvin Florida, Berry, Diaz, and Stephan Florida worked. These include round sheets, ledgers, and other documents that fall within one of the categories described above. While in certain instances the author of the seized

//

---

[2] The checks themselves and the other information contained in them are admissible as non-hearsay, self-authenticating verbal acts. *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004). They are further admissible as business records.

document is not identified in the document, this does not preclude its admission under Rule 801(d)(2)(E).

Numerous courts have held that the identity of a declarant of a written or oral statement need not be proven if "circumstantial evidence permits a finding by a preponderance of the evidence that there was a conspiracy involving the [declarant] and the defendant and the statement was made in the course and furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005) (affirming admission of an unsigned letter that was found in a place connected to a conspirator and the content of which demonstrated that it was written by someone involved in the conspiracy). "What is essential is that the government show that the unknown declarant was more likely than not a conspirator." *United States v. Helmel*, 769 F.2d 1306, 1313 (8th Cir. 1985) (affirming under Rule 801(d)(2)(E) admission of a ledger prepared by an unknown writer because the government "sufficiently proved that the declarant probably was a member of the conspiracy"). This is especially true where, as here, there is no "real mystery as to the participants in the . . . conspiracy" or the meaning of the statements themselves. *See United States v. Gil,* 58 F.3d 1414, 1419-20 (9th Cir. 1995); *see also United States v. Schmit*, 881 F.2d 608, 613 n.6 (9th Cir. 1989) (noting, in dicta, "[s]ince in this case there was sufficient proof of the declarant's identity, it is unnecessary to consider whether [knowledge of the declarant's identity] would be necessary where . . . other evidence establishes the requisite relationship of the declarant to the conspiracy."); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1581-82 (11th Cir. 1988) (although the witness received an anonymous phone call in connection with a bid-rigging conspiracy, testimony admitted because it was clear from the context of the testimony that the call was made in furtherance of the conspiracy); *accord United States v. Cruz*, 910 F.2d 1072, 1080-81 n.10 (3d Cir. 1990) (affirming admission of the oral statement of an unidentified female under Rule 801(d)(2)(E) and stating that "all the district court needed to know for the conspiracy determination was that the declarant, whoever she was, was connected to [the defendant] and [his coconspirator]").

Here, there is strong circumstantial evidence that the seized documents were made by conspirators in furtherance of the charged conspiracy. The documents closely resemble and are corroborated by round sheets and ledgers maintained by coconspirators who will testify at trial regarding the rigged and fraudulent real estate transactions. These documents were seized from the offices of

1 Monetary Investments, Alvin Florida's real estate investment business and the company through which he participated in the conspiracy. Berry, Diaz, and Stephan Florida also worked there. The documents were often interspersed with other, signed documents that defendants maintained for the properties. The documents contain the names of defendants and their coconspirators. In short, the context, location, and content of these documents is sufficient to establish by a preponderance of the evidence that the declarant author participated in the conspiracy and that statements contained in the document were made in furtherance of the conspiracy. No more than that is required for admission of the statements under Rule 801(d)(2)(E).

## CONCLUSION

The government respectfully submits that it has made the necessary preliminary showing under *Bourjaily* for the Court to conditionally admit the proffered coconspirator statements.

DATED: August 15, 2016

Respectfully submitted,

/s/ _____
Anna Pletcher
Manish Kumar
Ashley Eickhof
Trial Attorneys
Antitrust Division
U.S. Department of Justice