1  ANNA TRYON PLETCHER (CSBN 239730)
   MANISH KUMAR (CSBN 269493)
2  ASHLEY EICKHOF (CSBN 307143)
   U.S. Department of Justice
3  Antitrust Division
   450 Golden Gate Avenue
4  Box 36046, Room 10-0101
   San Francisco, CA 94102
5  manish.kumar@usdoj.gov
   Telephone: (415) 934-5300
6
7  Attorneys for United States of America
8
9                     UNITED STATES DISTRICT COURT
10                   NORTHERN DISTRICT OF CALIFORNIA
11                          OAKLAND DIVISION
12
13  UNITED STATES OF AMERICA          CASE NO. CR 4:14-00582 PJH
14              v.                    **DECLARATION OF FBI SPECIAL AGENT
                                      DEBORAH BOND IN SUPPORT OF UNITED
15  ALVIN FLORIDA, JR.,               STATES' NOTICE OF COCONSPIRATOR
    ROBERT ALHASHASH RASHEED,         STATEMENTS**
16  JOHN LEE BERRY, III,
    REFUGIO DIAZ, and
17  STEPHAN ALEXANDER FLORIDA,
18
19              Defendants.
20
21
22
23
24
25
26
27
28
    No. CR 4:14-00582 PJH
    DECL. IN SUPPORT OF US' NOTICE
    OF COCONSPIRATOR STATEMENTS

I, Deborah Bond, do hereby declare:

1.      Since September 2009, I have been the lead case agent in the FBI's investigation into allegations of bid rigging and fraud at public real estate foreclosure auctions in the San Francisco Bay Area, including Alameda County.  The following statements are based on my personal knowledge and review of witness reports, FBI 302s, documents, recordings, and other evidence and information available to me in my official capacity and from other FBI agents and DOJ staff involved in the investigation.

2.      In his January 17, 2012 interview, cooperating defendant Brian McKinzie indicated that he and other bidders would agree before or during the public auction to either stop bidding or refrain from bidding.

3.      In his November 9, 2011 interview, cooperating defendant Doug Moore indicated that bidding at the public auction would sometimes go in increments of $100 until the rounding bidders decided exactly who would be in the round and who would win the public auction.

4.      In his August 29, 2011 interview, cooperating defendant David Margen indicated that during the public auction, some of the colluding bidders would say words similar to, "Let's do a deal," or, "Can I take it?" or, "Do you want to take it?"  Alternatively, the colluding bidders would exchange winks, nods, or whispers.

5.      In his May 1 and 2, 2013 interview, cooperating defendant Michael Renquist indicated that after a group of bidders decided to conduct a round, a designated bidder would buy the property at the public auction and the others would stop bidding.

6.      In his August 29, 2011 interview, cooperating defendant David Margen indicated that during the public auction the bidders would first outbid any bidders who didn't participate in round robin auctions.

7.      In his October 25, 2011 interview, cooperating defendant Grant Alvernaz indicated that after the public auction, the winning bidder would give the crier endorsed cashier's checks. The crier would not fill out the receipt of sale until there was a break or until the end of the auctions. During this time period, the round participants would hold a round.  After the round was completed, the winner of

1  the round and the winner of the public auction would go to the crier to fill out the receipt and to swap

2  out the checks.

3      8.      In his September 7, 2011 interview, cooperating defendant David Margen described an

4  auction where defendant Florida agreed to accept a straight payoff from Margen to refrain from

5  bidding.

6      9.      In his May 1 and 2, 2013 interview, cooperating defendant Michael Renquist indicated

7  that during a round, the participants would form a circle and each participant would bid in increments

8  such as $200 or $500.

9      10.     In her March 13, 2013 interview, cooperating defendant Danli Liu indicated that the

10  payoff formula is sophisticated in that the people who stay in the round the longest are paid more than

11  those who drop out early.

12      11.     In her March 20, 2013 interview, cooperating defendant Danli Liu described an instance

13  where after a round was completed, Brian McKinzie went around and checked if each of the round

14  participants had enough funds to purchase the property and disqualified Ray Yeganeh from the round.

15      12.     In his January 17, 2010 interview, cooperating defendant Brian McKinzie indicated that

16  sometime in 2008 or 2009, Michael Marr began claiming two seats in the rounds, and that the multiple

17  seats increased Marr's commission.

18      13.     In his November 16, 2012 interview, cooperating defendant Robert Kramer described

19  round insurance roughly as follows:  If a round participant was interested in purchasing the property, he

20  or she could offer 'insurance' to another round 'participant.'  An insured round bidder has no interest in

21  owning the property and will be insured by another round bidder against the possibility of winning the

22  round.  In return, the insured bidder pays half of the money he wins at the round to the insuring bidder.

23  The insuring bidder will therefore pay out less if the insuring bidder wins the property.  If the insuring

24  bidder drops out of the round, he will receive a greater share of the round payout.

25      14.     In their January 9, 2014 interview, witnesses David Brown and Jenny Taylor, both

26  employees of trustee company Fidelity National Title Company, indicated that the trustee uses the

27  information recorded on the receipt of funds to prepare the trustee's deed.  The trustee would mail the

28

1    funds to their client and the Trustee's Deed to the buyer using the information listed on the sales

2    receipt.

3         15.    I have reviewed receipts of funds for bid-rigged properties in this investigation that

4    contain language to the effect of, Buyer's signature below indicates that the above information is true

5    and correct.

6         16.    In his September 10, 2014 interview, auctioneer Darius Ancheta indicated that he sent the

7    original cashier's checks and the original receipt of funds using FedEx to the trustee company for each

8    property sold at auction.

9         17.    In his September 7, 2011 interview, cooperating defendant David Margen indicated that it

10   was common practice to pay round money after the winning bidder receives the trustee's deed in the

11   mail.

12        18.    In his October 6, 2011 interview, cooperating defendant Thomas Franciose indicated that

13   rounds were usually paid by cash, but in 2009, some people paid for rounds by check.

14        19.    In his September 26, 2011 interview, cooperating defendant Jorge Wong indicated that

15   the rule followed by the colluding bidders was to pay any payoff money when the trustee's deed is

16   mailed to the final owner, which is usually ten days to two weeks after the sale.

17        20.    In his November 16, 2012 interview, cooperating defendant Robert Kramer indicated that

18   he met with other round participants from time to time to clear his round debts.  Kramer would

19   compare his calculations with each other person's calculations and had discussions with each person if

20   the calculations were different.  He did this at the foreclosure auctions and at the other person's office.

21        21.    In his January 11, 2011 interview, defendant Florida indicated that he had been in the

22   foreclosure auctions business for over 30 years.  He described defendant Rasheed as a former business

23   associate.

24        22.    In his January 12, 2011 interview, cooperating defendant Michael Renquist indicated that

25   defendant Florida acts like the "godfather."  In his January 11, 2011 interview, cooperating defendant

26   Peter McDonough described defendant Florida as the "king" of the auction.  In his September 29, 2011

27   interview, cooperating defendant Jorge Sum described defendant Florida as one of the "Big Fish," a

28   term that was used to describe the bidders who initiated rounds.

1    23.    In his November 16, 2012 interview, cooperating defendant Robert Kramer indicated that

2  he observed defendant Florida participating in rounds during the 1980s.

3    24.    In his November 9, 2011 interview, cooperating defendant Douglas Moore indicated that

4  Florida was the primary round leader in Alameda County.

5    25.    In his September 12, 2011 interview, cooperating defendant David Margen indicated that

6  if Florida was in the public auction, he was the one who usually instigated the subsequent round.

7    26.    In his November 19, 2012 interview, cooperating defendant Brian McKinzie indicated

8  that defendant Florida had a reputation of intimidating and threatening people at the auctions. In his

9  January 12, 2011 interview, cooperating defendant Michael Renquist indicated that he has seen

10  defendant Florida try to intimidate other investors to scare them into not bidding.

11    27.    In his May 1 and 2, 2013 interview, cooperating defendant Michael Renquist indicated

12  that on one occasion, defendant Florida attempted to force him to pay $5,000 for Florida to stop

13  bidding during an auction. In their May 11, 2011 interview, witnesses Gabriel and Jose Rios indicated

14  that on one occasion, defendant Florida approached Jose and asked for a $3,000 payoff to stop bidding.

15    28.    In his November 16, 2012 interview, cooperating defendant Robert Kramer indicated that

16  defendant Florida attempted to persuade people to participate in rounds. If they refused, defendant

17  Florida would try to outbid them or discourage them from attending the trustee sales.

18    29.    In her January 11, 2011 interview, cooperating defendant Danli Liu described defendant

19  Florida as verbally and physically intimidating. She indicated that he had a group of individuals

20  working for him,  On one occasion, defendant Florida told her that a property up for auction had been

21  burglarized and damaged, but she later determined that was not true.

22    30.    In his August 29, 2011 interview, cooperating defendant David Margen indicated that

23  defendant Florida often bullied the other bidders so he could lead the round robin auction. In his

24  February 19, 2010 interview, cooperator Gajan Thia indicated that 90% of the time, defendant Florida

25  led the round.

26    31.    In his July 26, 2013 interview, auctioneer Ron Ancheta described an incident where

27  defendant Florida asked him to give the purchase funds back because Florida's client had made a

28

mistake.  When Ancheta refused, defendants Florida and Berry and the client left the auction without signing the receipt of funds.

32.     In his January 17, 2012 interview, cooperating defendant Brian McKinzie indicated that defendant Florida hired four or five people to create an intimidating air about himself.  In his January 11, 2011 interview, cooperating defendant Jaime Wong indicated that defendant Florida brings large associates with him to the auctions to intimidate other buyers.  Defendant Florida also has people pretend they are interested in properties to intimidate others from bidding.

33.     In his March 5 and March 6, 2012 interview, cooperating defendant Brian McKinzie described how defendant Florida tracked information regarding rounds.

34.     In his November 9, 2011 interview, cooperating defendant Douglas Moore described defendant Rasheed (and defendant Florida) as one of the leaders of collusion in the Alameda County foreclosure auctions.

35.     In his September 29, 2011 interview, cooperating defendant Jorge Sum described defendant Rasheed as one of the "Big Fish," a term that was used to describe the bidders who initiated rounds.

36.     Approximately 31 witnesses have implicated defendant Rasheed in participating in rounds, and the investigation to date has uncovered evidence linking him to more than 200 bid-rigged properties.

37.     In her March 13, 2013 interview, cooperating defendant Danli Liu described an incident where defendant Rasheed attempted to convince her to pay defendant Florida $20,000 to stop bidding.

38.     In her April 6, 2011 interview, witness Dominique Maurer identified defendant Rasheed as one of the individuals who would lead a round.

39.     In his November 11, 2014 interview, witness Zouheir Joudi indicated that he took notes of rounds for defendant Rasheed.

40.     In his April 5, 2011 interview, cooperating defendant Chuokee Bo described an incident where defendant Rasheed took Bo to the bank so Bo could give him a round payoff in cash.

41.     In his January 11, 2011 interview, defendant Rasheed admitted to participating in private, secondary auctions for foreclosure properties.  Defendant Rasheed provided the interviewing agents

1   with a detailed description of how the secondary auctions operated and also discussed specific

2   secondary auctions that he had participated in.

3      42.    Approximately 14 witnesses have implicated defendant Berry in participating in rounds,

4   and the investigation to date has uncovered evidence linking him to more than 80 bid-rigged properties.

5      43.    In his January 11, 2011 interview, cooperating defendant Jorge Wong indicated that

6   defendant Florida always had representatives at the auctions, and he observed defendants Stephan

7   Florida and Diaz receiving direction from defendant Florida via cell phone.

8      44.    Approximately 15 witnesses have implicated defendant Diaz in participating in rounds

9   and/or payoffs, and the investigation to date has uncovered evidence linking him to more than 80 bid-

10  rigged properties.

11     45.    In his February 19, 2010 interview, cooperator Gajan Thia indicated that at the auctions,

12  defendant Diaz would negotiate with others to stop bidding.

13     46.    In his October 13, 2011 interview, cooperating defendant Eric Larsen indicated that JB,

14  Stephan LNU, and Cuco LNU, worked for Florida, participated in rounds, and kept notes.  He further

15  indicated that defendants Stephan Florida and Diaz frequently organized rounds.

16     47.    In his January 19, 2012 interview, cooperating defendant Brian McKinzie indicated that

17  defendant Diaz usually kept track of rounds for Florida.  In his September 13, 2011, interview,

18  cooperating defendant Jaime Wong indicated that defendant Diaz would approach Wong or his

19  business associate during the bidding process and ask for money to stop competing against them.

20     48.    Approximately 15 witnesses identify Stephan Florida as a round participant, and the

21  investigation to date has uncovered evidence linking him to more than 35 rigged properties.

22     49.    In her September 6, 2013 interview, cooperating defendant Irma Galvez identified

23  Stephan Florida, Cuco (defendant Diaz's nickname), and defendant Berry as part of the core group

24  individuals who attended the Alameda County foreclosure auctions on a nearly daily basis.

25  / /

26  / /

27  / /

28  / /

/ /

No. CR 4:14-00582 PJH
DECL. IN SUPPORT OF US' NOTICE
OF COCONSPIRATOR STATEMENTS       6

50.     In his October 17, 2011 interview, cooperating defendant Thomas Franciose indicated that his business associate Terry Cheng had told him that she had gone to defendant Florida's office to reconcile their accounts from rounds.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.   Executed on this _15_ day of August in Oakland, California.

Respectfully submitted,

DEBORAH BOND
Special Agent
Federal Bureau of Investigation

No. CR 4:14-00582 PJH
DECL. IN SUPPORT OF US' NOTICE
OF COCONSPIRATOR STATEMENTS        7