JOHN D. FORSYTH (SBN 178341)
The Law Office of John D. Forsyth
2431 Fillmore Street
San Francisco, CA 94115
415-401-0729 telephone
415-401-7609 facsimile
sotts@earthlink.net e-mail

RICHARD G. HULLINGER (SBN 294025)
Law Office of Richard G. Hullinger
1000 Brannan Street, Suite 488
San Francisco, CA 94103
Telephone: (415) 575-3588
Facsimile: (415) 522-1506
richardh@defendergroup.com

Attorneys for Defendant
JOHN LEE BERRY, III

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>JOHN LEE BERRY, III,<br><br>        Defendant. | Case No. CR 14-582 JD<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Date:  April 26, 2017<br>Time:  10:30 a.m.<br>Court: The Hon. James Donato |

## I. INTRODUCTION

John Berry's conduct was the result of desperation as he tried to support his wife and young children any way he could during a time of severe financial crisis. He was groomed by co-defendant Alvin Florida to act as an agent and proxy solely for Florida's interests and benefit. His employment for co-defendant Florida was little more than that of a day laborer. Trial testimony and evidence established six very significant facts:

    1.    John Berry is Alvin Florida's son-in-law;

2. John Berry was Alvin Florida's employee;

3. John Berry had no independent decision-making powers at the auctions;

4. John Berry acted on behalf of Alvin Florida's business interests and his client's interests;

5. John Berry received no compensation from any of the pay-outs from the rounds held subsequent to the auctions; and

6. John Berry took no ownership interest in any of the properties of interest in this case.

John Berry supports a family of five including his wife and 3 children. Despite being subject to prosecution in this case he maintained gainful employment since 2013 in an effort to provide for his family. His employers are well aware of the current situation and are still willing to afford him the ability to make an honest living and support his family if he is to remain at liberty. Any custodial sentence in this case will have a devastating effect on the Berry family.

## II. TRIAL AND THE PRESENTENCE INVESTIGATION REPORT

On December 15, 2016, defendant John Berry, III was found guilty of one count of bid rigging in violation of 15 U.S.C. § 1.

During the course of the trial cooperating co-conspirators testified that John Berry was the son-in-law and known employee of co-defendant Alvin Florida and acted on behalf of Florida's interests or the interests of Florida's clients. These witnesses confirmed that any payments made as a result of John Berry's participation in the rounds subsequent to the auctions were made directly to Florida. No evidence was ever presented that John Berry received any payment or shared in any ownership interests for any of the properties in question.

The cooperating witnesses described how John Berry took direction from Florida during the auctions and subsequent rounds either in person or via cell phone when Florida was not present. There were times that John Berry participated on his own during auctions and rounds but this was described as rare by cooperating witnesses and there was no evidence disputing the fact that he was acting on Florida's behalf at all times. The UCE and other witnesses testified

that they were approached by Florida employees about retaining the services of Florida. None of these witnesses ever identified John Berry as the employee who approached them or ever described John Berry explaining "the rules" to them with the solitary exception of the statement to the UCE that he could tap Florida on the shoulder indicating he wished to participate in the round.

When questioned under direct examination if John Berry participated in auctions and rounds independently, B.R. stated that this was a rare situation because Florida or other members of the Florida group were usually present. (Trial Transcript *hereinafter* TX pg. 478, ll. 2-4) This was confirmed on cross-examination. (TX pg. 572 ll. 18-21)

Cooperating witness D.D. testified that he never once observed John Berry generate a round sheet. (TX pg. 728, ll. 9-20) D.D. further testified that when his business group reconciled with Florida he understood that no payments were ever made to John Berry and that any payments made for the rounds that John Berry participated in were paid directly to Florida and his interests alone. (TX pg. 729, ll. 2-23)

No evidence was produced from the government at trial that indicated John Berry received any payment from Florida as a salary or commission for his participation in the auctions or rounds. No evidence was produced that indicated John Berry took any ownership interest in any of the properties in question.

The United States Probation Office has prepared a Presentence Investigation Report (PSR). The Guidelines calculation in the PSR provides for an adjusted offense level of 15. The PSR establishes a total criminal history score of zero and a Criminal History Category of I. PSR at ¶55. Mr. Berry has no objection to the factual content of the PSR.

The Guidelines in this case call for a sentence of 18-24 months imprisonment. The PSR recommends that Mr. Berry be sentenced to 6 months imprisonment, and 3 years of supervised release, including standard conditions of supervised release The PSR also recommends that Mr. Berry pay $105,999.05 in victim restitution. (PSR Sentencing Recommendation)

Mr. Berry fully endorses and adopts the PSR's careful analysis of his offense conduct, but objects to the PSR's guidelines calculation and restitution recommendation. Mr. Berry

contends that a reduction for minor participant should be applied pursuant to U.S.S.G. § 3B1.2(b) and that the adjustment under U.S.S.G. § 2R1.1(b) (volume of commerce) should be limited to the 1-point increase for bid-rigging because at all times Mr. Berry acted as Florida's agent. Thus, reducing his adjusted offense level to 11. In addition, Mr. Berry contends that there is no need for restitution in this case because the alleged losses are too speculative, and in any event the government has not satisfied their burden to establish the proper amount of restitution.

Mr. Berry respectfully submits that a 36-month term of probation conditioned upon 6 months home detention, and community service is sufficient, but not greater than necessary to accomplish the sentencing goals as set forth in 18 U.S.C. § 3553(a).

### III. BACKGROUND

John Berry has lived a blameless life prior to becoming involved with Alvin Florida. He was reared and educated in the Southeast United States. Despite an unstable family environment early on he found solace in sports and music. In 2000 he married Corine Berry. The marriage produced 3 children aged 6 years to 17 years. Mr. Berry is an active participant in the lives of his children.

John Berry was employed in the auto sales industry prior to 2007. In that year he lost his job and the family was forced to live on their savings. When those funds were exhausted the entire family moved in with his wife's step father, Alvin Florida. Florida provided a home and stability for the children. He then provided John Berry a chance to earn $10.00 per hour working in his business. (PSR at ¶40 and attached letter from Corine Berry) John Berry naively accepted the job in a desperate attempt to provide for his family and get back on his feet.

Attached with this Sentencing Memorandum are letters from friend and family of John Berry. There is one resounding theme in virtually every letter: John Berry is a dedicated family man who provides for his family. This not only includes the requisite financial provisions, but also the support of a loving husband and father involved in the day-to-day

activities of his children. That is the laudable goal that many modern parents strive for in this day and age.

Finally, letters from the community reveal that John Berry is a spiritual man of conscience and service. (*See attached letter from Pastor George Matthews of the Men of Valor Academy*) John Berry has provided guidance and leadership to the youth of his community for a number of years predating his involvement with Alvin Florida.

### IV. THE OFFENSE

The PSR accurately summarizes Mr. Berry's offense conduct, but several aspects bear additional emphasis here.

Significantly, the evidence at trial more than suggests that John Berry was a minor participant in the conspiracy acting only as a paid employee and agent for Florida and his interests. What the PSR investigation and letters from the family and community reveal is that John Berry and his family were suffering a severe financial crisis and his actions were consistent with a man struggling to avoid financial devastation.

### APPLICABLE SENTENCING LAW

The landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), changed sentencing in the Federal Courts. *Booker* renders the Guidelines as advisory only, and instructs the sentencing courts to consider the Guidelines in context of all of those factors enumerated in 18 U.S.C. § 3553(a). "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." *Booker*, 543 U.S. at 660-661.

The Supreme Court addressed the issue of the "presumption of reasonableness" of a within Guidelines sentence in *Rita v. United States*, 551 U.S. 338 (2007), and instructed that a within Guideline sentence is presumed reasonable only upon appellate review. The Court stated:

> We repeat that the presumption before us is an appellate court presumption. Given our explanation in *Booker* that appellate "reasonableness" review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review. The sentencing judge, as a matter of process, will normally

5

begin by considering the presentence report and its interpretation of the Guidelines. [Citations.] He may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines, to apply, [citation], perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. [Citation.] Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. [Citations.] In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. [Citation.]" *Id.* at 351.

Further, the Court instructed that, "The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness. Even the Government concedes that the appellate courts may not presume that every variance from the advisory Guidelines is unreasonable." *Id.* at 354. The Ninth Circuit reiterated this premise in *United States v. Edwards*, 595 F.3d 1004, 1015 (9th Cir. 2010), holding that a reviewing court cannot presume a sentence is substantively unreasonable only because it falls outside the range recommended by the Sentencing Commission.

The Ninth Circuit was heard on the presumption of reasonableness and directed that even on appeal the presumption of a Guideline sentence may not be reasonable. It stated that, "A court of appeals may not presume that a non-Guidelines sentence is unreasonable. Although a court may presume on appeal that a sentence within the Guidelines range is reasonable, [citation] we decline to adopt such a presumption in this circuit." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). The Court in *United States v. Ressam*, 629 F.3d 793, 828 (9th Cir. 2012) (en banc), defined "substantive reasonableness":

> A substantively reasonable sentence is one that is sufficient, but not greater than necessary to accomplish §3553(a)(2)'s sentencing goals. The touchstones of "reasonableness" is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 USC §3553(a). In determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range.

The Guideline range is simply the beginning of the analysis for sentencing, not the end. The Ninth Circuit stated, "The Guideline's factor may not be given more or less weight than any other. So while the Guidelines are the starting point and initial benchmark and must be kept in mind throughout the sentencing process, the Guideline's range constitutes only a touch-stone in the district court's sentencing consideration." *United States v. Autery*, 555 F.3d 864, 8172 (9th Cir. 2009) (internal quotation marks omitted).

The Court must now consider 18 U.S.C. § 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The court, in determining the particular sentence to be imposed, shall consider –

   (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
   (2) The need for the sentence imposed –
       (a) to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;
       (b) to afford adequate deterrence to criminal conduct;
       (c) to protect the public from further crimes of the defendant; and
       (d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner
   (3) the kinds of sentences available;
   (4) the kinds of sentence and the sentencing range established for [the offense under the Guidelines];
   (5) any pertinent policy statement;
   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct
   (7) the need to provide restitution to any victims of the offense.

The sentencing court is now required to consider factors that the Guidelines effectively prohibited from consideration (*e.g.*, Age, USSG 5H1.1; Education and Vocational Skills, USSG 5H1.2; Mental and Emotional Condition, USSG 5H1.3; Physical Condition Including Drug or Alcohol Dependence, USSG 5H1.4; Employment, USSG 5H1.5; Family Ties and Responsibilities, USSG 5H1.6; Socio-economic Status, USSG 5H1.10; Civic and Military Contributions, USSG 5H1.11; and Lack of Youthful Guidance, USSG 5H1.12.) *United States*

*v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005) (en banc). To consider the "history and characteristics of the defendant," the Court must now consider factors the Guidelines eschewed.

Finally, the Supreme Court has cautioned that respect for the law is promoted in many ways, not always measured by the strictness of sentences or the nature of harsh sanctions. The Court stated:

> Moreover, the unique facts of [defendant's] situation provide support for the District Judge's conclusion that, in [defendant's] case, a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing. *Gall v. United States*, 552 U.S. 38, 54 (2007) (internal quotation marks omitted).

In order to meet the mandate of the *Booker* remedy, then, this Court must calculate the appropriate guidelines range and may consider appropriate departures or variances. It must also apply the 3553(a) factors and address any other specific characteristics of the defendant or his offense that might impact the determination of a "reasonable" sentence under the particular circumstances of this case. The court must then consider the statutory parsimony provision and impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in §3553(a)(2). The District Court's sentencing decision will then be subject to an abuse-of-discretion review by the circuit. *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010) (reversal is appropriate only if district court's sentence is "illogical, implausible, or without support in inferences that may be drawn from facts in the record.").

### A. Application of 2-Point Decrease In Offense Level for Minor Participant Under U.S.S.G. § 3b1.2(b).

A defendant is entitled to a 2-point decrease in offense level if the defendant was a "minor participant" in the criminal activity. U.S.S.G. § 3B1.2(b). Application Note to U.S.S.G. § 2R1.1 (bid-rigging) states that: "For purposes of applying § 3B1.2, an individual defendant should be considered for a mitigating role adjustment only if he were responsible in some minor way for his firm's participation in the conspiracy."

A "minor participant" is described as a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id*.

*Sentencing Commission Application Note 5*. The Sentencing Commission has provided guidance for applying the minor participant adjustment. For example, a defendant who is accountable for a loss amount that greatly exceeds the defendant's personal gain from a fraud offense may receive a 2-point offense level reduction under this guideline. *Id. Sentencing Commission Application Note 3(A)*. The application of this guideline is heavily dependent on the facts of the particular case, however the Court should consider:

    (i)    the degree to which the defendant understood the scope and structure of the criminal activity;

    (ii)    the degree to which the defendant participated in planning or organizing the criminal activity;

    (iii)    the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

    (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

    (v)    the degree to which the defendant stood to benefit from the criminal activity. *Id. Sentencing Commission Application Note 3(C)(i)-(v)*.

As detailed above, John Berry's role in the offense meets all of the above criteria. Consequently, Mr. Berry was a minor participant in the offense and is entitled to a 2-point decrease in offense level.

**A. Application of U.S.S.G. § 2R1.1(b) Volume of Commerce.**

John Berry objects to the 2-level increase for volume of commerce. The PSR recommends a 2-level increase pursuant to U.S.S.G. §2R1.1(b)(1), "volume of commerce." PSR at ¶44. The guidelines provide that "the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation." U.S.S.G. 2R1.1(b)(2). Mr. Berry contends that he was not engaging in bid-rigging as an individual, but rather as an agent of Alvin Florida or as his principal. Mr. Berry was merely Florida's employee and as such the 2-level increase is

inapplicable. Mr. Berry had no decision-making power whatsoever and at all times was acting on behalf of Florida as Florida's principal. The quoted language contained in the guideline manifests the sentencing commission's understanding that the individual with decision-making power (*i.e.*, the boss) is liable for his employee's actions. It would be unfair to increase Mr. Berry's guidelines based upon the decisions of Alvin Florida—particularly since Mr. Berry was an employee who presumably made the same amount of money regardless of the volume of commerce affected by the offense.

## V. A SENTENCE OF 36 MONTHS PROBATION, CONDITIONED UPON A TERM OF 6 MONTHS HOME DETENTION IS SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING IN THIS CASE

John Berry finds himself in this predicament as a result of his misguided, albeit laudable, efforts to find financial stability in order to provide for his family and get back on his feet. As a result of this conviction the Berry family now stands on the brink of financial ruin once more. Should John Berry suffer a custodial sentence for any length of time he will lose the opportunity he currently has with his employers to keep his job and stay on his feet. (*See the attached letters from his superiors at Autocom Nissan East Bay*) Most importantly, his family will be cast asunder and forced to rely on the charity of other family members who reside in another far-away state. If the Court is inclined to order restitution in this matter, John Berry is the only defendant who stands in a position to comply with that order as he is gainfully employed.

### A. The Offense Was An Aberration In An Otherwise Productive and Lawful Life.

The letters from his family and community prove that John Berry is a family man and hard worker who has never been in trouble until he lost his job and found himself in a desperate situation. As a result he became involved with a person he not only trusted, but also felt a blind obligation to as a result of Alvin Florida taking the Berry family into his home. The letters describe a man of character and strength who lovingly provided for and supported his family through thick and thin. He remains that man of character and fortitude today. Given the chance, he will continue to do so.

### B. Mr. Berry Did Not Realize the Extent of Harm.

John Berry found himself in a sophisticated arena where he had neither experience nor expertise. He operated at the behest and direction of Alvin Florida for an hourly wage. Trial testimony reveals he was a known employee and acted under Florida's direction. There is nothing in his background of employment or education that would suggest he had any notion of how his actions had any effect on the economy. He was instructed to bid at auctions and the associated rounds to obtain properties or payments for Florida and Florida's interests alone.

### VI. THERE IS NO NEED FOR RESTITUTION IN THIS CASE

Restitution in the present case is discretionary. PSR ¶37. The Court need only consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Mr. Berry contends that there is no need to provide restitution to the alleged victims, *i.e.*, Bank of America; Black Knight Financial Services; CitiMortgage; HomeBridge Financial Services; J.P. Morgan Chase Bank; MERSCORP Holdings, Inc.; Ocwen Loan Servicing, LLC; OneWest Bank FSB; PLM Lender Services; Wells Fargo Bank; and U.S. Bank Home Mortgage (the "Banks") because (1) neither the government nor the probation office has presented the Banks' actual claims of loss or documentation in support of the Banks' claims of loss to Mr. Berry; (2) the amounts claimed in the PSR with respect to each property assumes that the property would have sold for the same amount but for the bid-rigging by Mr. Berry and his co-conspirators; and (3) the amount listed in the PSR does not represent the actual loss suffered by the Banks for the properties in which Mr. Berry was involved in the secondary auctions.

In any event, even if the Court determines that there is a need to provide restitution to the Banks in this case, the Court does not possess sufficient information to determine the cause or amount of restitution owed to the Banks because the government and probation office have not disclosed the methodology that was used to determine the losses attributable to Mr. Berry or the underlying evidence upon which the government relied upon. If the Court determines that restitution is appropriate in this case, Mr. Berry requests an evidentiary hearing on the matter to determine whether the government has met its burden with respect to the actual amount owed by Mr. Berry individually.

According to the PSR, Mr. Berry is liable for restitution in the amount of $105,999.05. PSR at ¶36. This amount is to be paid to the Banks that allegedly owned the foreclosed properties that were the objects of secondary auctions between Mr. Berry and other co-conspirators. The PSR calculates restitution based upon the "amount of payoffs for rounds that the government was able to identify that Berry received on behalf of Alvin Florida." *Id.* The PSR provides a chart listing 68 properties that were allegedly purchased by a co-conspirator during the secondary auctions. Mr. Berry is alleged to have participated in those rounds and to have received payouts ranging from $250 to $13,052. Neither the government nor the probation office allege that Mr. Berry kept any of these funds. Rather, Mr. Berry was merely an agent or proxy of Alvin Florida and all payouts were paid, if at all, directly to Alvin Florida.[1]

A defendant has a right under the Due Process Clause to notice and the opportunity to challenge any information that may be used to deprive him of life, liberty or property at sentencing, including victim impact statements and information provided by victims regarding restitution. *Burns v. United States*, 501 U.S. 129, 137-83 38 (1991); *Gardner v. Florida*, 430 U.S. 349, 351, 358 (1977); *United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 741 (1948). This right is protected through various provisions of Rule 32 and Rule 26.2, which require notice in the presentence report; the opportunity to investigate, object and present contrary evidence and argument to the probation officer; the opportunity to file a sentencing memorandum and argue orally to the court; the opportunity for a hearing; the right to obtain witness statements, to have witnesses placed under oath and to question witnesses at any such hearing; and the right to have the court resolve any disputed matter. Fed. R. Crim. P. 32(e)(2), (f), (g), (h), (i); Fed. R. Crim. P. 26.2(a)-(d), (f). These protections apply to information about victim impact and restitution. *United States v. Rakes*, 510 F.3d 1280, 1285-86 (10th Cir. 2007); Fed. R. Crim. P. 32(d)(2)(B), (D); 18 U.S.C. § 3664(a), (b), (e).

---

[1] The evidence at trial established that not all payouts relating to rounds were actually made. Thus, without additional evidence that the payouts were actually made with respect to all 68 properties the government cannot meet their burden to establish that Mr. Berry is liable for the restitution sought.

12

Restitution in this case is governed by 18 U.S.C. § 3664, which provides that in determining whether to order restitution and the amount of restitution, "the court shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." *United States v. Mills*, 991 F.2d 609, 611 (9th Cir. 1993). In reviewing restitution orders, circuit courts require that "the district judge had at his disposal information bearing on the considerations enumerated in section 3664. [Citations] There must also be some indication that the judge gave thought to the relevant information." *Id.*

The probation officer is required to include "information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C.S. § 3664(a). This information includes "to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant." *Id.* In addition, "if the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court." *Id.* Section 3664 also provides that "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). Finally, "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."

1    Restitution is unnecessary here since it does not appear that the Banks have a made a
2 claim to any of the alleged losses. Had the Banks done so, the probation office and would have
3 notified the Court and the parties in the PSR.[2] The fact that the Banks have not made claims
4 when invited to do so by the probation officer under the notice requirements of 18 U.S.C. §
5 3664(d) supports the conclusion that there is little, if any need for restitution in this case.
6    The restitution amount alleged in the PSR is far too speculative. Essentially, the PSR
7 concludes that Mr. Berry is liable for some portion of restitution based upon the theory that the
8 payouts in the rounds equal the amount the winning bidder in the round would have paid at the
9 public auction. This theory has a certain logic to it, but it is purely speculative and not
10 supported by any evidence.
11    Finally, the restitution amount does not represent actual losses sustained by the Banks.
12 The evidence at trial established that the opening bids at the public auctions were set by the
13 Banks and represented the Banks' bid on the property. In other words, the Banks did not set
14 the opening bid based upon a number that would encourage public bidding, rather it was the
15 Banks' bid based upon the Banks' determination of the value of the property. In fact, the
16 Banks ended up purchasing over 80% of the foreclosed properties at the public auctions at the
17 opening bid price. Surely, if the Banks intended to encourage bidding wars to drive up the sale
18 price, then they would not have routinely set the opening bid at amounts that virtually
19 guaranteed that the Banks would end up with the winning bid.
20    All 68 properties listed in the PSR were purchased at public auction at prices above the
21 Banks' initial bid. Since the Banks set the initial bid based upon their own determination of
22 fair market value there was no actual loss to the Banks.
23    As stated above, if the Court determines that restitution is proper in this case Mr. Berry
24 respectfully requests an evidentiary hearing to determine whether the Banks themselves have
25 made any claims; the government's methodology in determining restitution; whether the
26 evidence produced by the government can sustain the government's burden; whether restitution

---

[2] Counsel requested any documentation submitted to the government by the Banks in support of the restitution claims. The government informed counsel that all loss-related documents had been previously produced in discovery.

should be apportioned between co-defendants and co-conspirators in other cases; whether joint and several liability is appropriate; and, finally, which individuals should be held jointly and severally liable with respect to each of the 68 properties listed.

## VII. CONCLUSION

For the foregoing reasons, Mr. Berry respectfully asks the Court to impose a sentence of 36 months probation, conditioned upon 6 months home detention, and community service and find that such a sentence is sufficient, but not greater than necessary to accomplish the sentencing goals of 18 U.S.C. § 3553(a).

Respectfully submitted,

DATED: April 12, 2017          By:   /s/ John D. Forsyth
                                     JOHN D. FORSYTH
                                     RICHARD G. HULLINGER
                                     Attorneys for Defendant
                                     JOHN LEE BERRY, III